OPINION
On December 12, 1996, Buckeye Business Forms, Inc. ("Buckeye") filed a complaint in the Franklin County Court of Common Pleas against Larry A. Sutton and Carros Printing Corp. dba Fine Line Graphics ("Fine Line"). Mr. Sutton had been an employee and shareholder of Buckeye. Buckeye averred that on March 27, 1996, Buckeye and Mr. Sutton entered into a no-compete covenant. Buckeye further averred that in April 1996, Mr. Sutton became employed with Fine Line, a competitor of Buckeye. Buckeye claimed that Mr. Sutton breached the no-compete covenant, Fine Line assisted Mr. Sutton in breaching the no-compete agreement, and Mr. Sutton and Fine Line misappropriated trade secrets in violation of R.C. 1333.51(C) and 1333.61. Buckeye requested compensatory and punitive damages, attorney fees, and injunctive relief.
By way of a brief background, Mr. Sutton had been a 50/50 shareholder in Buckeye, with Ann K. Patton owning the other half of Buckeye's shares. Buckeye is a distributor and manufacturer of business forms and other printed products. Buckeye also provides general commercial printing. Prior to being part-owner of Buckeye, Mr. Sutton had been employed by Buckeye as a sales representative. When he left Buckeye in March 1996, Mr. Sutton had been with Buckeye for 17 years.
On March 27, 1996, Mr. Sutton entered into a share purchase agreement with Buckeye and Ms. Patton whereby Mr. Sutton agreed to sell his shares to Ms. Patton. As partial consideration for such purchase, Mr. Sutton executed a no-compete covenant. Such covenant, in essence, prohibited Mr. Sutton from rendering services, directly or indirectly, to any competing business relating to the sale, manufacture, distribution, or promotion of a product, process or service used by Mr. Sutton at Buckeye that would be for sale to any existing or prospective customer of Buckeye. Attached to the no-compete covenant were lists of Buckeye's existing and prospective customers. The prohibitions in the no-compete covenant were in effect for a period of eighteen months.
On June 3, 1996, Mr. Sutton began working for Fine Line, a competitor of Buckeye. Mr. Sutton was hired, essentially, to organize a business forms division for Fine Line. Within the eighteen-month period covered under the no-compete covenant and while Mr. Sutton was employed by Fine Line, Fine Line made sales of business forms and provided certain commercial printing services to businesses found on Buckeye's existing and prospective customer lists.
On September 18, 1997, Buckeye moved for partial summary judgment. On November 20, 1997, the trial court rendered a decision finding Mr. Sutton admitted to particular breaches of the no-compete covenant, and Mr. Sutton had a duty not to improperly disclose Buckeye's customer list or use such list to his own pecuniary advantage. In an entry filed December 30, 1997, the trial court found, pursuant to Buckeye's motion for partial summary judgment, that the no-compete covenant was valid and reasonable, that Mr. Sutton breached the no-compete covenant, that Buckeye's customer lists were trade secrets, that Mr. Sutton misappropriated trade secrets, and that there were material issues of fact remaining regarding Fine Line's breach of the no-compete covenant. The issue of damages for Mr. Sutton's breach was to be determined at trial, and Buckeye would also be given the opportunity to prove additional breaches of the no-compete covenant.
On January 9, 1998, Buckeye filed a motion for a permanent injunction against Mr. Sutton, seeking, in part, an injunction prohibiting Mr. Sutton from providing certain services to Fine Line, in accordance with the no-compete covenant, for eighteen months from the date of judgment. On January 21, 1998, Buckeye requested that the issue of attorney fees be bifurcated. The trial court granted Buckeye's "request" in an order and entry dated February 4, 1998. On April 13, 1998, Buckeye filed a motion for leave to file a first amended complaint instanter, adding a claim against Fine Line for tortious interference with contract. On June 12, 1998, the trial court granted Buckeye's motion for leave to file a first amended complaint.
A bench trial was held. On January 21, 1999, the trial court rendered a decision. The trial court found Mr. Sutton breached the no-compete covenant by being involved, directly or indirectly, in Fine Line's sale of conflicting products to three existing customers of Buckeye. However, the trial court found that the no-compete covenant did not preclude Mr. Sutton from being employed by a competing business nor did it preclude him from being involved in the organization of a business forms division for a competing business. Further, the trial court found that Mr. Sutton did not act maliciously in regard to the three breaches that had occurred. The trial court found Mr. Sutton did not misappropriate any trade secrets beyond the three breaches, and Fine Line had not tortiously interfered with Buckeye's business relationships or contracts. The trial court denied Buckeye's request for prospective injunctive relief given that Fine Line had not tortiously interfered with any business relationship or contract and since only "minor" breaches had occurred. As to damages for the three breaches and misappropriations of trade secrets, the trial court found that Buckeye was entitled to its lost profits in regard to the three sales or Fine Line's gain on such sales, whichever was greater.
On January 27, 1999, Buckeye filed a request for findings of fact and conclusions of law. On February 12, 1999, the trial court granted Buckeye's request. On March 9, 1999, the trial court journalized an entry which contained, in essence, the findings of the court as set forth in its January 21, 1999 decision. Mr. Sutton was ordered to pay $1,164.79 in damages.
Buckeye (hereinafter "appellant") has appealed to this court, assigning the following errors for our consideration:
Assignment of Error No. 1
 The Trial Court committed prejudicial error when it found that the breach of the No-Compete Covenant by Appellee Larry A. Sutton was limited to three sales.
Assignment of Error No. 2
 The Trial Court committed prejudicial error when it found that the misappropriation of trade secrets by Appellee Larry A. Sutton was limited to three sales.
Assignment of Error No. 3
 The Trial Court committed prejudicial error in failing to find Appellee Carro Printing Corp. dba Fine Line Graphics misappropriated trade secrets.
Assignment of Error No. 4
 The Trial Court committed prejudicial error when it found Appellee Carro Printing Corp. dba Fine Line Graphics did not tortiously interfere with Appellant's business relationship or contract, specifically the No-Compete Covenant with Appellee Sutton.
Assignment of Error No. 5
 The Trial Court committed prejudicial error in denying Appellant prospective injunctive relief in light of the Trial Court finding three specific, separate instances of breach of contract and misappropriation of trade secrets, and a contractual provision providing for injunctive relief in the event of breach.
Assignment of Error No. 6
 The Trial Court committed prejudicial error in not awarding Appellant attorney fees in light of the Trial Court's finding of three instances of breach of contract and a contractual provision providing for an award of attorney fees.
In its first assignment of error, appellant contends the trial court erred in finding Mr. Sutton's breach of the no-compete covenant was limited to three sales. As indicated above, the trial court found the no-compete covenant did not prohibit Mr. Sutton from working for a competing organization and that Mr. Sutton's breach of the covenant was limited to sales made to three of appellant's existing customers. Appellant asserts that the language in the no-compete covenant is much broader in scope and covers more than just direct, personal sales made by Mr. Sutton. Appellant contends that under the no-compete covenant, Mr. Sutton could not work for any competitor in any capacity with regard to any product appellant provided to its existing or prospective customers.
For example, appellant asserts Mr. Sutton breached the covenant by providing services to Fine Line of: establishing a vendor network, creating and marketing a business forms brochure, pricing products, and training sales personnel. Further, appellant contends that because Mr. Sutton provided services to Fine Line with regard to conflicting products, each and every sale made by Fine Line to an existing or prospective customer of Buckeye, whether Mr. Sutton was involved directly in such sale, constituted a breach of the no-compete covenant.
Before setting forth the pertinent language of the no-compete covenant, we note that the cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties. Foster WheelerEnviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.
(1997), 78 Ohio St.3d 353, 361. The intent of the parties to a contract is presumed to reside in the language they chose to employ in the contract, and common words will be given their ordinary meaning unless manifest absurdity results or some other meaning is clearly evidenced from the face or overall content of the instrument. Id. Interpretation of a clear and unambiguous contract is a matter of law, and review of such is de novo.Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm (1995), 73 Ohio St.3d 107,108.
The no-compete covenant states, in pertinent part:
 In consideration of the sale and purchase of the Shareholder's Shares in Buckeye Business Forms, Inc., the undersigned agrees that he shall not, without Buckeye Business Forms, Inc.'s prior written consent do the following things for the following time periods:
 A) render services, directly or indirectly, to any Conflicting Organization relating to the manufacture, sale, distribution, or promotion of a Conflicting Product for sale to any existing customer of Buckeye Business Forms, Inc. for a period of eighteen (18) months from the date of this Covenant. A list of existing customers is attached hereto as Exhibit "1";
 B) render services, directly or indirectly, to any Conflicting Organization relating to the manufacture, sale, distribution, or promotion of a Conflicting Product for sale to any non customers to whom proposals or solicitations were made by Buckeye Business Forms, Inc. during the period of sixty (60) days prior to the date of this Contract. A list of non-customers to whom proposals or solicitations were made is attached hereto as Exhibit "2";
 * * * For purposes of this Agreement, Conflicting Product means any product, process or service of any person or organization other than Buckeye Business Forms, Inc., whether in existence or under development, which substantially resembles or competes with a product, process, or service upon or with which Sutton worked during his employment with Buckeye Business Forms, Inc., or about which Sutton acquired at any time confidential information.
 For purposes of this Agreement, Confidential Information means information and know how disclosed to or known by Sutton which related to the Buckeye Business Forms, Inc.'s existing or proposed or anticipated business, products, processes, services, sales, research or commercial activities and which is not generally known in the relevant trade or industry, including without limitation, trade secrets, proprietary data and information related to inventions, purchasing, engineering, product development, sales and customers. (Emphasis added.)
We note there is no dispute that Fine Line was a "Conflicting Organization" as used in the above covenant. We agree with appellant's assertion, as a general matter, that the no-compete covenant is broad in its scope. It does not merely prohibit Mr. Sutton from being directly involved in an actual sale of a conflicting product. However, we also agree with the trial court's conclusion that the above covenant did not prohibit Mr. Sutton from working for a conflicting organization. If the parties wished to so limit Mr. Sutton, they could have stated so in simple language. Instead, the agreement prohibited Mr. Sutton from rendering certain services to Fine Line. These services were limited to the manufacture, sale, distribution or promotion of a product, process or service that, in essence, substantially resembled or competed with a product, process or service with which Mr. Sutton worked during his employment with appellant. In addition and most importantly, such services must relate to a conflicting product or service that is for sale to appellant's existing or prospective customers.
Therefore, the no-compete covenant did not prohibit Mr. Sutton from directly or indirectly manufacturing, promoting or distributing a conflicting product that would be for sale to organizations other than appellant's existing or prospective customers. In addition, Mr. Sutton could, directly or indirectly, sell a conflicting product to an organization other than appellant's existing or prospective customers. In essence, the contract prohibited Mr. Sutton from rendering the services delineated if such services related to a conflicting product that was for sale to appellant's existing or prospective customers. Hence, Mr. Sutton did not breach the contract simply by virtue of his duties in setting up a business forms division for Fine Line.
Mr. Sutton arguably could not render services that would eventually result in the sale of a conflicting product to appellant's existing or prospective customer. However, the only way to prove such a breach would be to show a sale to appellant's existing or prospective customers. We make this determination based upon the language the parties chose to employ in the covenant. For example, the agreement did not state that Mr. Sutton was prohibited from providing services relating to the manufacture, distribution, sale or promotion of a conflicting product. Rather, the covenant states that Mr. Sutton could not render services relating to the manufacture, distribution, sale or promotion of a conflicting product that was for sale toappellant's existing or prospective customers. We emphasize again that there did not have to be an actual sale in order for there to have been a breach. However, any alleged wrongful service by Mr. Sutton had to relate to an eventual, potential or actual sale to one of appellant's existing or prospective customers.
With the above in mind, we now turn to the record to determine whether the trial court correctly found that only three breaches occurred. Mr. Sutton was hired by Fine Line to develop a business forms division. During the eighteen-month period covered under the no-compete covenant, Mr. Sutton provided the following general services to Fine Line. Mr. Sutton sold commercial printing and business forms, designed a brochure regarding the business forms division, established a network of vendors from whom Fine Line would purchase forms and printing, trained the sales staff regarding business forms sales and did the majority of pricing of forms. As a general matter, none of these activities constituted a breach of the no-compete covenant.
However, Fine Line did make specific sales to many of appellant's existing customers — customers that Fine Line had not had prior to Mr. Sutton's employment. The question becomes whether or not such sales were prohibited under the no-compete covenant. We find that they were. Because Mr. Sutton was responsible for setting up Fine Line's business forms division as set forth above, any sale by Fine Line of a conflicting product to one of appellant's existing customers can be linked to Mr. Sutton's services to Fine Line. For example, in pricing conflicting products, training sales staff and setting up a vendor network from whom Fine Line would purchase certain conflicting products, Mr. Sutton was involved, even if only indirectly, in the sale of conflicting products. If there was evidence that such conflicting products were sold to appellant's existing customers, then breach of the no-compete covenant was shown.
The evidence shows that Mr. Sutton was somehow directly involved in the eventual sale of conflicting products to three of appellant's existing customers. However, the evidence also shows that Fine Line made sales of conflicting products to many more of appellant's existing customers — organizations that had not been customers of Fine Line's until Mr. Sutton became employed by Fine Line. Specifically, appellant introduced into evidence plaintiff's exhibit No. 8. Such exhibit set forth four lists or categories: (1) sales allegedly made by Fine Line to appellant's existing customers that had not been prior customers of Fine Line, (2) sales allegedly made by Fine Line to appellant's existing customers that had also been previous customers of Fine Line, (3) sales allegedly made by Fine Line to appellant's prospective customers that had not been prior customers of Fine Line, and (4) sales allegedly made by Fine Line to appellant's prospective customers that had also been previous customers of Fine Line.
As to the first category, the following sales were prohibited under the no-compete covenant: sales to Bank One Corp., Boehm Stamping Printing Co., the city of Columbus, Lane Bryant, Medibill, Ohio Operating Engineers and Scriptel Corp.[1] All of these organizations were on appellant's existing customer list. Mr. Sutton testified that all the business forms sold by Fine Line were the same product he had sold while working for appellant. (Tr. 105.) Therefore, all the sales of business forms to these organizations constituted breaches of the no-compete covenant. However, in addition to the sale of business forms to these organizations, the evidence shows that Fine Line also provided commercial printing services to such organizations. The sale of such services also constituted breach because the evidence shows that appellant provided such services in its business.
Fine Line's invoices relating to the above sales show that Fine Line provided commercial printing services including one, two and four-color processing. Ms. Patton testified that while appellant did not have the equipment to do four-color processing, appellant did sell products produced by such processing. Id. at 219. Even Mr. Sutton testified that appellant often procured various commercial printing jobs from third parties and then sold such to its customers. Id. at 43-44. We also note the evidence shows that at the closing of the share purchase agreement, Mr. Sutton was required to turn over certain documents, one of which was a pending quote to a customer of appellant for a four-color process brochure. Id. at 229. Because appellant had the capabilities of providing such services, the sale by Fine Line of such services to appellant's existing customers also constituted breach.
Ms. Patton was unable to point to any specific evidence directly linking Mr. Sutton to the above sales. Id. at 267, 269, 270, 273, 300. However, this was unnecessary. As already discussed above, Mr. Sutton's duties relating to the setting up and running of Fine Line's business forms division serve as the link, albeit indirect, to the eventual sale of conflicting products to existing customers. Hence, all of the sales to the organizations listed above, including commercial printing services, constituted sales of conflicting products to appellant's existing customers. Therefore, all such sales constituted breaches of the no-compete covenant, and the trial court erred in not so finding.
The above logic applies as well to the remaining categories. In such categories, Fine Line sold conflicting products to appellant's existing or prospective customers. As to categories two and four, it is immaterial that these organizations had already been customers of Fine Line prior to Mr. Sutton's employment. The no-compete covenant does not make an exception for organizations that had previously been customers of a competing business. Therefore, breaches occurred when sales were made to appellant's customers or prospects. We note, however, that the record does not indicate that certain organizations listed in Category 2 were on appellant's existing customer list. Such organizations were: "O.S.U. — Nat. Res.," "O.S.U. — Accts. Payable," and "Sherwin Williams."[2] Hence, sales by Fine Line to these organizations did not constitute breach.
In summary, the trial court erred in its interpretation of the no-compete covenant, and the evidence adduced at trial shows that there were many more breaches than found by the trial court. Accordingly, this cause must be remanded to the trial court for a determination of damages. We note that appellant must prove that its alleged damages were caused by Mr. Sutton's breach.
In accordance with the above, appellant's first assignment of error is sustained.
In its second assignment of error, appellant contends the trial court erred in finding Mr. Sutton had not misappropriated trade secrets beyond the three sales discussed above. Appellant argues that the very nature of Mr. Sutton's duties at Fine Line resulted in him using confidential information gained from his employment with appellant. Specifically, appellant asserts that Mr. Sutton misappropriated information regarding appellant's supplier/vendor network, customer service, marketing and pricing of forms, and other financial information. We find appellant's contentions not well-taken.
R.C. 1333.61 states, in pertinent part:
 As used in sections 1333.61 to 1333.69 of the Revised Code, unless the context requires otherwise:
 (A) "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.
(B) "Misappropriation" means any of the following:
 (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;
 (2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:
* * *
 (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]
* * *
 (D) "Trade secret" means information, including the whole or any portion or phrase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
 (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
 (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
In order to enjoy presumptive trade secret status, the possessor of a trade secret must take some active steps to maintain its secrecy. Fred Siegel Co., L.P.A. v. Arter Hadden
(1999), 85 Ohio St.3d 171, 181. A claimant asserting trade secret status has the burden of identifying and demonstrating that the material is included in the categories of protected information under the statute. Id. There being no presumption that any particular idea acquired by an employee is a trade secret, the trial court should examine those facts that show the extent to which information is known outside the business and the precautions taken to guard the secrecy of the information. SeeWater Management, Inc. v. Stayanchi (1984), 15 Ohio St.3d 83, paragraphs one and two of the syllabus.
In a trade secrets case, the conflicting rights of an employer to enjoy the use of secret processes and devices that were developed through its own initiative and investment must be balanced or reconciled with the right of employees to earn a livelihood by utilizing their personal skill, knowledge and experience. Valco Cincinnati, Inc. v. N D Machining Service,Inc. (1986), 24 Ohio St.3d 41, 46. Such balancing may be facilitated by distinguishing between knowledge and skill that is general in the trade as a whole and "secret" knowledge that is acquired particularly and specifically from the employer. Id.
Applying the foregoing legal concepts to the facts in this case, the evidence shows that knowledge relating to vendors was, by definition, not a trade secret pursuant to R.C.1333.61(D). The existence and identity of vendors was public knowledge, readily ascertainable by anyone in the industry. (Tr. 203-205.) As to any knowledge Mr. Sutton acquired regarding customer service in general, the case law cited above allows employees to take with them such general information and skill. There is no evidence, for example, that Mr. Sutton acquired some kind of "secret" knowledge about customer service particular to his employment with appellant. As to any financial information acquired by Mr. Sutton from appellant, the evidence shows that Fine Line did not utilize any financial information other than that which it had always used. Id. at 76, 126-130, 169, 195-198, 206, 212.
In short, appellant did not demonstrate that the information described above constituted trade secrets or that Mr. Sutton misappropriated any information that could be considered a trade secret. Accordingly, appellant's second assignment of error is overruled.
In its third assignment of error, appellant contends the trial court erred in failing to find that Fine Line misappropriated trade secrets. Appellant contends that Fine Line was a joint tortfeasor because it hired Mr. Sutton specifically to set up a business forms division. In addition, appellant asserts that Fine Line is liable under the theory of respondeat superior
for any misappropriation by Mr. Sutton. There is no evidence Fine Line misappropriated any of appellant's trade secrets. The evidence discussed under appellant's second assignment of error applies to the contentions herein as well. Indeed, the only specific evidence that could be related to this issue is that Fine Line told Mr. Sutton to stay away from appellant's customers. Id. at 161, 191-192. As discussed above, Mr. Sutton was permitted to work for a competitor of appellant. The mere hiring of Mr. Sutton to develop a business forms division did not constitute the misappropriation of trade secrets.
As to appellant's arguments regarding respondeatsuperior, we have previously determined that appellant failed to show Mr. Sutton misappropriated trade secrets. Therefore, even ifrespondeat superior was applicable to the situation here, Fine Line would not be liable as there was no underlying misappropriation by Mr. Sutton.
Given all of the above, appellant's third assignment of error is overruled.
In its fourth assignment of error, appellant contends the trial court erred in finding Fine Line had not tortiously interfered with appellant's business relationships or contract (the no-compete covenant). Appellant asserts Fine Line hired Mr. Sutton to perform duties that would necessarily require that Mr. Sutton breach the covenant. We note first that we have already determined that the no-compete covenant did not preclude Mr. Sutton from working for a competitor. Thus, Fine Line did not tortiously interfere with appellant's business relationships or contract merely in hiring Mr. Sutton. The question then becomes whether or not there was evidence to support appellant's contentions that Fine Line otherwise engaged in tortious interference. We find there was not.
The elements of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. Fred Siegel Co., L.P.A., supra, at paragraph one of the syllabus. As to tortious interference with a business relationship, such tort generally occurs when a person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or to not perform a contract with another. A B-AbellElevator Co. v. Columbus/Cent. Ohio Bldg. Constr. Trades Council
(1995), 73 Ohio St.3d 1, 14.
We had previously determined that Mr. Sutton breached the no-compete covenant by virtue of the sales made to appellant's existing and prospective customers. However, there is no evidence that Fine Line purposely caused these breaches. In addition, there is no evidence to support a finding that Fine Line somehow engaged in other tortious conduct. Accordingly, appellant's fourth assignment of error is overruled.
In its fifth assignment of error, appellant contends that the court erred in denying it prospective injunctive relief. The trial court found appellant had failed to demonstrate it was entitled to such relief. The trial court based such conclusion, at least in part, on the fact that Mr. Sutton committed only "minor" breaches. In light of our conclusion that Mr. Sutton in fact committed many breaches, the issue of the appropriateness of prospective injunctive relief must be revisited by the trial court. To this extent, appellant's fifth assignment of error is sustained.
In its sixth assignment of error, appellant contends the trial court erred in failing to award attorney fees. Appellant asserts that it is entitled to attorney fees under the share purchase agreement and for any misappropriation of trade secrets. Mr. Sutton argues that attorney fees should not be awarded because of the de minimus nature of his breaches. The trial court never actually reached the issue of attorney fees, presumably because it determined only minor breaches occurred and no willful behavior was shown. For the following reasons, we find the issue of attorney fees must be addressed by the trial court upon remand.
Appellant is not entitled to attorney fees under R.C.1333.64(C) as such requires willful and malicious misappropriation. To the extent the trial court found any misappropriation by Mr. Sutton, it was correct to conclude that such was not willful and malicious. As to Fine Line, there was no misappropriation. However, the trial court did err in failing to consider the appropriateness of attorney fees in light of the share purchase agreement.
As indicated above, Mr. Sutton executed a share purchase agreement with appellant. Such agreement states, in pertinent part:
G. Indemnification.
 1. Sutton shall indemnify, hold harmless and defend the Purchaser:
 i) on account of breach of any of the representations and warranties and agreements of Sutton contained in this Agreement and any associated documents and agreements delivered by Sutton pursuant to this Agreement[.]
* * *
 The foregoing indemnification shall cover any and all losses, claims, damages or liabilities, joint or several, and any legal, attorneys fees or other reasonable expenses (including the cost of any investigation and preparation) reasonably incurred in connection with investigating, prosecuting or defending any such losses, claims, damages or liabilities suffered on account of or in connection with the foregoing. (Emphasis added.)
Contractual provisions calling for the payment by one party of the other party's attorney fees are generally enforceable. Goldfarb v. The Robb Report, Inc. (1995), 101 Ohio App.3d 134,147. Because Mr. Sutton breached the no-compete covenant, as determined by this court and the trial court, appellant may be entitled to attorney fees pursuant to the share purchase agreement. This issue must be addressed by the trial court upon remand. For this reason, appellant's sixth assignment of error is sustained.
In summary, appellant's first, fifth and sixth assignments of error are sustained. Appellant's second, third and fourth assignments of error are overruled. Accordingly, the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part. The cause is remanded to the trial court with instructions to conduct further proceedings consistent with this opinion.
Judgment affirmed in part and reversed in part and causeremanded with instructions.
LAZARUS, P.J., and KENNEDY, J., concur.
[1] We have excluded the sales to Birchwood Meats, Telecom Products Corp. and Tri-State Supply Co., which the trial court correctly found constituted breaches.
[2] As to Sherwin Williams, the record shows that appellant's customer was Sherwin Williams in Columbus, and Fine Line's customer was Sherwin Williams in Cleveland. Appellant has not shown that these two organizations constituted one customer for purposes of this case.